**Leon WOLFORD, Plaintiff–Appellee,**

v.

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,
Defendant–Appellant.**

Nos. 01–5694, 02–6336.

United States Court of Appeals,
Sixth Circuit.

Feb. 24, 2004.

David A. Burkhalter, II, Burkhalter, Rayson & Associates, Knoxville, TN, Cecil W. Laws, Kingsport, TN, W. Carr Hagan, Jr., Banner Elk, NC, for Plaintiff–Appellee.

James T. Shea, IV, Baker, McReynolds, O'Kane & Atkins, Knoxville, TN, Benjamin R. Civiletti, Mitchell Y. Mirviss, Nell M.B. Strachan, Venable, Baejter & Howard, Baltimore, MD, for Defendant–Appellant.

Before SILER, BATCHELDER, and COOK, Circuit Judges.

SILER, Circuit Judge.

In this Tennessee diversity case, a jury found that Massachusetts Mutual Life Insurance Company ("MassMutual") fraudulently induced Leon Wolford into resigning his "career" contract with General Agent Tom King. MassMutual appeals the district court's denial of its multiple post-judgment relief motions arguing that (1) it cannot be liable of fraudulently inducing Wolford to resign his contract when the contract was at-will; (2) there was insufficient evidence for the jury to find fraud; (3) the district court improperly awarded punitive damages; and (4) the district court should have reopened the case based on the discovery of a recording of the telephone conversation between its agent King and Wolford during which the fraudulent inducement occurred. We RE-VERSE for the reasons stated hereafter.

## FACTUAL BACKGROUND

MassMutual contracts with "general agents" to sell and maintain its insurance policies. The "general agents" in turn contract with "special agents" to also sell and maintain the policies. Pursuant to this arrangement, MassMutual entered into an at-will contract with General Agent King, who in turn entered into an at-will "career" contract with Special Agent Wolford. Under this career contract, Wolford would collect "non-vested" renewal and persistency commissions in the future as long as he was still under this contract. When Wolford eventually resigned, these renewals totaled approximately $1 million.

In March 1997, allegations surfaced accusing Wolford of falsely adding to a doctor's report on an insured client's claim and of extending policies to ineligible people. Wolford had come up with an attrac-tive "package" for coal miners providing life, disability, and health insurance as an alternative to costly worker's compensation insurance. MassMutual had a requirement that no policy be issued to a miner who worked more than six hours per week underground. The allegations accused Wolford of misrepresenting several miners' job titles to get around this requirement and also of filling in parts of a doctor's certification regarding the claim of Grant Norman under his insurance policy. MassMutual's Field Practices Committee ("FPC") investigated these allegations and elected to terminate Wolford.

However, because MassMutual had no direct power to terminate Wolford under his contract, it directed King to fire Wolford. MassMutual asked King to terminate Wolford, but King resisted, wanting to know MassMutual's reasons. MassMutual claimed that Wolford improperly supplemented the doctor's report. After it was found that MassMutual arguably required agents to fill in the doctor's reports as Wolford had, MassMutual then asserted that Wolford's additions were incorrect. Again, MassMutual was wrong; the doctor later confirmed Wolford's additions. After King's resistance and request for further investigation, the FPC further investigated the allegations.

In June 1997, MassMutual's FPC told King and Wolford that the investigation had uncovered that the miners were ineligible, and accused Wolford of insurance fraud. (Litigation discovery later proved MassMutual's investigation uncovered that the miners were in fact eligible for the policies.). Wolford's request for specifics was rebuffed by MassMutual. On June 6, King told Wolford that he might face legal actions for fraud, resulting in heavy monetary liability and possible jail time. On July 8, 1997, MassMutual again directed King to terminate Wolford.

On July 13, 1997, King instead opted to telephone Wolford, informing him that he might be terminated soon and advising Wolford to resign and take a broker contract with MassMutual. King suggested that if Wolford was fired he would have trouble getting another job with a premium insurance agency and that by taking the broker contract Wolford would continue to receive his non-vested renewal and persistency commissions. Wolford resigned and signed the broker contract the next day. The broker contract was signed and approved by MassMutual on August 4, 1997. On September 22, 1997, pursuant to MassMutual's direction, King terminated the broker contract.

## PROCEDURAL BACKGROUND

Wolford filed suit alleging (1) MassMutual tortiously interfered with his contract with King; and (2) MassMutual made, through its Agent King, intentional misrepresentations that induced him to resign his career contract. MassMutual filed a counterclaim against Wolford.

At trial, the jury found that MassMutual (1) was a party to both Wolford's career and broker contracts with King; and (2) made intentional misrepresentations to Wolford to induce him to resign his career contract with King. It granted $1.9 million in compensatory damages and $54.9 million in punitive damages, and rejected MassMutual's counterclaims.

MassMutual, pursuant to Fed.R.Civ.P. 50 and 59, requested that the district court enter judgment dismissing Wolford's claim or, in the alternative, grant a new trial or a remittitur. MassMutual also moved, pursuant to Rules 58, 59(e), and 60, to amend, correct, and/or vacate the district court's judgment. The district court rejected all of MassMutual's post-trial motions, but it eventually remitted the punitive damages to $7.6 million.

During the pendency of this first appeal (No. 01–5694), MassMutual discovered allegedly new evidence. After the verdict in Wolford's favor, King instituted an action against MassMutual for, *inter alia*, tortious interference with his contract with Wolford. MassMutual learned that King had recorded the telephone conversation between Wolford and King regarding Wolford's resignation. Wolford was not aware that King had recorded the conversation.

MassMutual moved for relief from judgment in the instant case (No. 01–5694). Premised upon Rule 60(b)(2), MassMutual argued that the audiotape recording was newly discovered evidence which contradicted both Wolford's and King's trial testimony in the Wolford litigation and would have likely altered the outcome of the case. Furthermore, pursuant to Fed.R.Civ.P. 60(b)(3), MassMutual alleged that King and Wolford concealed the recording and provided false testimony. Finally, MassMutual maintained that it was entitled to relief under the catch-all provision, Fed. R.Civ.P. 60(b)(6).

The district court denied all of MassMutual's motions under Rule 60(b). Although finding MassMutual exercised due diligence in obtaining the recording, the district court ruled that MassMutual failed to demonstrate that the recording was material evidence that would have clearly produced a different result at trial. As the recording did not constitute newly discovered evidence, MassMutual had no other recourse under Rule 60(b). This second appeal (No. 02–6336) followed, and was consolidated with the first appeal.

## DISCUSSION

### Sufficiency of the Evidence

The jury found that MassMutual fraudulently induced Wolford to resign his career

contract. In a diversity case, this court reviews a Rule 50 sufficiency of the evidence claim under the forum state's standard of review. *See K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir.1996). Under Tennessee law, when ruling on a Rule 50 motion, "the trial court should consider all evidence introduced by the non-moving party, draw all reasonable inferences from that evidence, disregard all countervailing evidence and, if there is any competent evidence about which reasonable minds could differ, the trial court should overrule the motion." *Harrogate Corp. v. Sys. Sales Corp.*, 915 S.W.2d 812, 817 (Tenn.Ct.App.1995) (citation omitted).

Fraud in Tennessee requires proof of: (1) an intentional misrepresentation of material fact, (2) involving a past or existing fact (or promise of future action with no present intent to perform), (3) knowledge of the representation's falsity, and (4) an injury caused by reasonable reliance on the representation. *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566–567 (6th Cir.2003). Without belaboring the other elements, any fraud by MassMutual did not injure Wolford.

Interestingly, Wolford did not initially lose his commissions by resigning. If King had not terminated the broker contract, Wolford would have continued to receive all his commissions, including the non-vested. (J.A. 01–5694, at 945.) It was only after King, at MassMutual's direction, terminated the broker contract that Wolford lost his non-vested commissions. However, Wolford had no actionable claim for the loss of this contract against MassMutual. He cannot bring a wrongful termination claim against MassMutual be-

cause King was the only party with the direct power to fire Wolford.[1] Since MassMutual, even though it was a party, did not have the direct power to terminate Wolford, any claim regarding the loss of his broker contract would be a tortious interference claim against MassMutual. Generally, under Tennessee law, a party cannot tortiously interfere with its own contract. *See Purisch v. Tenn. Technological Univ.*, 76 F.3d 1414, 1420 (6th Cir. 1996) ("A party to a contract cannot be held liable for procuring the breach of that contract."); *Forrester v. Stockstill*, 869 S.W.2d 328, 331 (Tenn.1994) (finding claim for wrongful interference by a third person actionable only if that person stood as third party to the employment relationship). Since the jury found that MassMutual was a party to the career and broker contracts, the district court dismissed the procurement/interference claim, and the parties have not appealed that issue.

Since Wolford cannot claim tortious interference or wrongful termination, the only fraud claim Wolford could assert is wrongful inducement to resign. Normally, this claim is brought when one employer uses a misrepresentation about duration, benefits, or financial strength to lure an employee from a job with another employer. When the employee has no breach of contract or wrongful termination action, courts have allowed the employee to assert a fraudulent inducement claim for the loss of the former job. The damage is the loss of pay or benefits. While Tennessee does not have any law directly on point, other state courts have allowed this type of fraud claim. *See, e.g., Liggett Group, Inc. v.*

---

**1.** Because both the career and broker contracts between Wolford and King were "at-will," King cannot be held liable for the termination under Tennessee's strict "at-will" contract doctrine. *See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn.1997) (An

at-will contract may be terminated by either party "for good cause, bad cause, or no cause at all without being guilty of legal wrong."). If Agent King cannot be liable, then any vicarious/agency type claim against MassMutual must fail.

*Sunas,* 113 N.C.App. 19, 437 S.E.2d 674, 681 (1993); *Berger v. Sec. Pac. Info. Sys.,* 795 P.2d 1380, 1384 (Colo.Ct.App.1990) (relied on by the district court); *Sea–Land Serv. v. O'Neal,* 224 Va. 343, 297 S.E.2d 647, 651–53 (1982). We assume without deciding that the Tennessee Supreme Court would also allow this type of fraud claim.

Wolford claimed damages of non-vested renewal commissions, fringe benefits, office expenses, pension benefits, and income from continued sales, things that he forfeited when he resigned—and things he would have lost had he been terminated. The evidence showed that if Wolford did not resign, King would have lawfully terminated him. At all times, both Wolford and King maintained that Wolford resigned specifically to avoid termination. King's uncontroverted testimony stated that he would have fired Wolford had he not resigned.[2] (JA, 01–5694, at 1049–50.) Moreover, and most injurious to Wolford, King eventually terminated the broker contract at MassMutual's direction. (JA, 01–5694, at 473–74.)

The damages for fraud are calculated by placing the injured party in the same position he would have occupied had the fraud not occurred. *Shahrdar v. Global Housing, Inc.,* 983 S.W.2d 230, 238 (Tenn.Ct. App.1998). Here, had the fraud not occurred, Wolford would not have resigned but King would have fired him, leaving Wolford in exactly the same position he is in now—that is, without the non-vested commissions or other damages he claims.

Thus, we REVERSE the lower court's finding that there was sufficient evidence to find MassMutual liable for fraud because MassMutual's misrepresentations caused Wolford no injury. Consequently, since fraud was the only claim the jury returned in favor of Wolford, the punitive damages naturally must be dismissed, and there is no need to discuss any of MassMutual's remaining assignments of error.

REVERSED.

---

**2.** KING: "... I had planned if I did not receive an acceptance letter of his resignation I planned to go to Kingsport and ... go through the termination process. Since I had received his letter of acceptance I didn't need to travel to Kingsport to do the termination."

Wolford argues that King testified that he would not have fired Wolford without a reason, but this testimony was only referring to MassMutual's initial request. (JA, 01–5694, at 1087–88).